UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

A.D. and D.D., individually and on behalf of their son, Z.D.,

Plaintiffs,

-against-

IRVINGTON UNION FREE SCHOOL DISTRICT,

Defendant.

25-CV-5824 (JGLC)

**OPINION AND ORDER**

JESSICA G. L. CLARKE, United States District Judge:

Plaintiffs A.D. and D.D. (collectively, "Parents"), on behalf of their son Z.D., bring this action under the Individuals with Disabilities Education Act (the "IDEA"). They ask the Court to reverse a State Review Officer ("SRO") Decision that found that Defendant Irvington Union Free School District ("Irvington" or the "District") offered Z.D. a free appropriate public education ("FAPE") during the 2022-2023 and 2023-2024 school years, when Z.D. was in fourth and fifth grade. An Impartial Hearing Officer ("IHO") had previously found that the District failed to offer Z.D. a FAPE for the first of those two school years, but had offered Z.D. a FAPE for the subsequent year. The SRO reversed the IHO's decision with respect to the 2022-2023 school year and agreed with the IHO that the District had offered Z.D. a FAPE during the 2023-2024 school year.

Both parties now move for summary judgment on the administrative record. Parents highlight procedural and substantive deficiencies to argue that the District failed to offer Z.D. a FAPE during both the 2022-2023 and 2023-2024 school years. They ask the Court to reverse the SRO's decision in its entirety. They also seek reimbursement for tuition at the Windward School

("Windward"), a private school where they enrolled Z.D., for both the 2022-2023 and 2023-2024 school years. The District contends that the SRO's decision should be upheld in its entirety.

This Court, in accordance with established case law, plays a circumscribed role in reviewing state educational decisions under the IDEA and must defer to the expertise of administrative officers when appropriate. Accordingly, and for further reasons detailed herein, the Court DENIES Plaintiffs' motion for summary judgement and GRANTS Defendant's motion for summary judgment.

## BACKGROUND

### I. IDEA Statutory Framework

Under the IDEA, states receiving federal special education funding are required to provide a free appropriate public education to children with disabilities. 20 U.S.C. § 1400(d)(1)(A); *see also T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 151 (2d Cir. 2014). To provide a FAPE to each student with a disability, a school district must develop an individualized education program ("IEP") that is "reasonably calculated to enable the child to receive educational benefits." *Ventura de Paulino v. N.Y.C. Dep't of Educ.*, 959 F.3d 519, 525 (2d Cir. 2020) (quoting *T.M. ex rel. A.M.*, 752 F.3d at 151).

"The IDEA also requires states to provide an administrative procedure for parents to challenge the adequacy of their children's IEPs." *Mendez v. Banks*, 65 F.4th 56, 59 (2d Cir. 2023) (citing 20 U.S.C. § 1415(b)(6)). New York has implemented a two-tier system of administrative review. N.Y. Educ. Law § 4404; *see also Ventura de Paulino*, 959 F.3d at 526. "In the first tier, a parent can file an administrative 'due process complaint' challenging the IEP and requesting a hearing before an [IHO]." *Ventura de Paulino*, 959 F.3d at 526 (internal citation omitted). In the second tier, parties aggrieved by the IHO's decision can appeal to an SRO. *Id.*; *see also R.E. v.*

*N.Y.C. Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012). "Once the state review officer makes a final decision, the aggrieved party may seek judicial review of that decision in a state or federal trial court." *Ventura de Paulino*, 959 F.3d at 526; *see* 20 U.S.C. § 1415(i)(2)(A).

## II. Factual Background

The Court endorsed the parties' proposal to forgo Rule 56.1 statements and state the facts from the administrative record in narrative form. ECF No. 14 ¶ 6. Neither party seeks to supplement that record. *See id.* Therefore, unless otherwise noted, the following facts are taken from the parties' briefing—citing to the administrative record—and from the administrative record itself.[1]

Plaintiffs A.D. and D.D., on behalf of their son Z.D., ask this Court to reverse an SRO decision that concluded that Defendant Irvington offered Z.D. a FAPE during the 2022-2023 and 2023-2024 school years, when Z.D. was in fourth and fifth grade. *See* ECF No. 16 ("Pl. Mot."). Z.D., who is now thirteen years old, has been diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"), combined presentation; Specific Learning Disorder in Reading (Dyslexia); Specific Learning Disorder in Written Expression (Dysgraphia); Generalized Anxiety Disorder; and Social Phobia. Pl. Mot. at 1 (citing P. Ex. C at 10; Ex. 33 at 28–29; SRO Decision at 2).

When Z.D. was one, his Parents began to notice "speech delays." Tr. 1093:12–13. They started teaching him sign language to communicate concepts like "more." *Id.* at 17–19. Z.D.'s pediatrician suggested waiting until he was 18 months old before testing him. Tr. 1093–94. At that point, Z.D. was evaluated and qualified for Early Intervention ("EI"). *Id.* He received speech

[1] The Court references different parts of the administrative record as follows: Citations to District Exhibits are "Ex."; to Parent/Petitioner Exhibits are "P. Ex."; and to the Transcript are "Tr.". The Court cites to the SRO decision dated May 1, 2025, as "SRO Decision" and to the IHO decision dated November 14, 2024, as "IHO Decision."

and occupational therapy ("OT"). Ex. 8 at 1. As Z.D. turned five and transitioned to the Committee on Preschool Education ("CPSE"), he continued to receive OT services; however, he was found ineligible for an IEP. *Id.* at 2. Z.D.'s Parents decided to extend his pre-K by one year. IHO Decision at 6 (citing Tr. 1094)); *see also* Ex. 8 at 2.

By kindergarten, one of Z.D.'s Parents testified, his "speech was still an issue": he could not read words or rhyme, and could only "sometimes . . . identify letters and sounds." Tr. 1095:13–16. The District's Committee on Special Education ("CSE") classified Z.D. with a Speech or Language Impairment and recommended that he receive speech therapy and OT twice weekly. Ex. 8 at 2. Z.D. then began "to complain about getting pulled out from his class" for these sessions. Tr. 1095:18. Z.D. told his Parents that he felt stupid and that he did not like school. *Id.* at 1095:21. When Z.D.'s Parents shared their concerns with his Kindergarten teacher, the teacher responded that Z.D. was "doing well." *Id.* at 1097:11. According to Z.D.'s Kindergarten report card, he ended the school year reading at grade level with accurate comprehension, recognizing sight words, and "show[ing] pride in his writing." Ex. 2 at 1. Z.D. was "discharged from OT services at the end of Kindergarten after meeting his goals." IHO Decision at 7 (citing Ex. 10).

The next year, in first grade, Z.D.'s teachers began "noticing his reading difficulties and speech and language challenges." IHO Decision at 7 (citing Tr. 1098); *see also* ECF No. 18 ("Def. Mem.") at 1. According to one of his Parents, Z.D. could not read words, could only sometimes identify letters and sounds, could not rhyme, and continued to complain about getting pulled from his classroom. Tr. 1098:12–17. In October 2019, towards the start of the school year, the District provided Z.D. with Response To Intervention ("RTI") services from a literacy specialist. Ex. 3; Ex. 8 at 4. Those services continued when the school moved to distance

learning during the COVID-19 pandemic. Ex. 8 at 4. By the end of the school year, however, Z.D.'s report card reflected that in many reading-related areas he was only "progressing toward," not meeting, curriculum expectations. Ex. 4 at 4. Z.D.'s teacher noted that he would "need to read this summer in order to maintain his skills and improve his fluency." Ex. 4 at 1.

By second grade, according to his Parent's testimony, Z.D. was "floundering": "he was crying daily"—both before school in the morning and at bedtime—and was "fighting [his Parents] to do his homework." Tr. 1100:14–19. At the start of the school year, Z.D. again worked with an RTI literacy specialist and began to see the school's psychologist for additional support. IHO Decision at 9. Z.D.'s private therapist sent the school psychologist a clinical summary note that indicated that Z.D. "struggles with attention, focus, distractibility, and physical restlessness," and contained a "working diagnosis" of ADHD, combined type, as well as concerns about a "possible language-based learning disability in reading and writing." Ex. 8 at 1. By December 2020, Z.D. started to take ADHD medication. Ex. 43 at 1.

That same month, as Z.D. continued reading and writing below grade level, the CSE met to reevaluate his needs. Ex. 9 at 1–2. The District recommended moving Z.D. into an Integrated Co-Teaching ("ICT") class, a general education class taught at grade level where a special education teacher in the classroom can support students in smaller groups. Tr. 1100–02; IHO Decision at 12. Z.D. was classified as a student with an Other Health Impairment, IHO Decision at 12 (citing Ex. 9), and the District removed RTI services because of its ICT recommendation, IHO Decision at 13 (citing Tr. 665; Ex. 43). Z.D.'s Parents agreed with the District's recommendations, and he was moved into an ICT class. Ex. 9 at 1; *see* IHO Decision at 50. Z.D.'s Parents also hired a private reading tutor. Tr. 1103:9–12. The CSE stated that the District

would conduct additional tests "in the fall to determine [Z.D.]'s need for academic support through special education." Ex. 9 at 2.

By March 2021—still in second grade—Z.D. was integrating well into his ICT class. *See* Tr. 67:23–69:2. The school psychologist noted that he "seem[ed] happier and more motivated." Ex. 43 at 2. His Parents agreed, responding to the psychologist that the move "seems to be a very positive transition and I don't think we could have asked for a better outcome." *Id.* When the CSE met again in April, Z.D.'s Parents shared that they had noticed their son's academic progress since he had entered the ICT class, but also worried that Z.D. tended to "picture read" at home and could "have a 'meltdown' if unfamiliar with a text." Ex. 12 at 1. Z.D.'s reading remained "slightly below grade level." Ex. 13 at 1. The CSE recommended that Z.D. continue in the ICT program, supplemented by speech/language therapy and counseling, in third grade—and his Parents agreed with the recommendations. *Id.*

At the start of third grade, Z.D. was reading at the level of a student starting second grade. IHO Decision at 15 (citing Tr. 196–97; P. Ex. EE). He continued in the ICT program and was enrolled in a class of 17 students, four of whom were classified on an IEP. *Id.* at 14 (citing Tr. 193). In class, the Special Education teacher provided three hours of ICT services per day addressing the third-grade curriculum. *Id.* at 15; Tr. 289:20–22. The teacher also worked with Z.D. on his individual goals outside of those three hours of ICT instruction. Tr. 289:23–290:25. Based on Z.D.'s "individual needs," the teacher took different approaches—such as working in smaller group settings or working with Z.D. individually during WIN (What I Need) time. Tr. 286:12–24; IHO Decision at 15. RTI was also added back into Z.D.'s schedule. IHO Decision at 50 (citing Tr. 665).

Z.D.'s Special Education teacher communicated with Z.D.'s parents about his instruction and progress throughout the school year. Tr. 236:9–11. Z.D.'s parents also attended two parent-teacher conferences during the year. *Id.* The teacher "felt [Z.D.] was progressing at a satisfactory pace" and testified that "it appeared as though [Z.D.'s Parents] were in agreement." *Id.* at 12–20. All the while, Z.D. continued in counseling—where he was reportedly an "active participant." IHO Decision at 17. Z.D.'s school psychologist testified that he expressed that he did not like leaving class for their sessions and felt like the only student who had to do so. *Id.* (citing Tr. 155). But the psychologist did not recall Z.D. saying that others were calling him stupid because he was pulled from class to attend counseling. *Id.*

The CSE met again towards the end of the school year to plan Z.D.'s fourth-grade year—the first CSE meeting and IEP at issue in this case. IHO Decision at 17; *see* Pl. Mot. at 4 ("Parents are not seeking relief for inappropriate programming prior to the 2022-23 school year."). The meeting took place on April 7, 2022. Ex. 14 at 1. Z.D.'s school psychologist chaired the meeting, which also included Z.D.'s special education teacher, general education teacher, speech/language therapist, and Parents. *Id.*

The April 2022 CSE discussed Z.D.'s "educational performance, strengths and needs." *Id.* According to the meeting summary, Z.D.'s special education teacher stated that Z.D.'s study skills had improved, Z.D. "participates actively in class," and Z.D. "is willing to try and works well with others." *Id.* At the same time, the teacher reported that Z.D. "can lose focus at times and requires redirection," Z.D.'s "work pace can be quick and he can have some difficulty with writing when rushing," and "attention to detail while he is reading is a need." *Id.*

Socially, Z.D.'s general education teacher reported that Z.D. "gets along well with his peers" and that, while Z.D. "can be competitive at times," he was "better able to take ownership

of his behavior now." *Id.* As a result, the school psychologist and all of Z.D.'s teachers agreed that Z.D. had "achieved his social-emotional-behavioral goals," and the CSE concluded that the District would discontinue Z.D.'s counseling services. *Id.* at 1–2.

In setting out Z.D.'s IEP for fourth grade, the CSE determined that the District would continue ICT services three hours per day, as well as speech/language therapy in a small group setting for thirty minutes once every week. Ex. 14 at 1. The CSE added that Z.D. would receive "required" accommodations "such as assistance with pacing, checking for understanding, breaking down tasks containing multiple steps, refocusing/redirection, and preferential seating," as well as "[g]raphic organizers and editing checklists." *Id.* at 7. Z.D.'s special education teacher believed that this IEP would address Z.D's needs because Z.D. would have two teachers in his ICT classroom, could work in small groups when he needed, and "would have his needs met for any reading and/or writing difficulty that he was having." Tr. 257:2–17; *see* IHO Decision at 21 (citing Tr. 257–58). The special education teacher raised no concerns about Z.D. failing to meet grade level expectations in reading and writing because Z.D. "was progressing towards grade level expectations." Tr. 310:6–7.

The school psychologist concurred. *See* IHO Decision at 22 (citing Tr. 93). The psychologist testified that "the program and services and goals that were developed were appropriate to make progress the following year." Tr. 93:9–11. Because "evaluations of [Z.D.]'s cognitive functioning and intellectual functioning" showed that he had "a fairly even profile in the average range," the psychologist explained that [Z.D.] "would be able to access the general education" that an ICT setting would provide. Tr. 93:22–94:2. Like the special education teacher testified, the psychologist affirmed that because Z.D.'s IEP offered "flexibility," two teachers in

the classroom, and the ability to work with Z.D. in small groups or one-on-one, the proposed plan would support Z.D.'s needs in fourth grade. *See* Tr. 94.

Z.D.'s Parents, on the other hand, were "extremely frustrated." Tr. 1111:12–13. Z.D. "was still complaining and struggling about his reading, his writing, [and] getting pulled," one Parent testified. Tr. 1109:16–17. Z.D. "felt stupid" and "was getting made fun of and bullied every day." Tr. 1110:10–12. To the Parents, it "made no sense" that Z.D. had apparently achieved his social-emotional-behavioral goals given these continued difficulties. Tr. 1109:19. So, at the April 7, 2022 meeting, the Parents announced that they would seek a private evaluation of Z.D. from the Child Mind Institute. Tr. 1111:14–16; Ex. 14 at 2; *see* Ex. 16. Later that month, they did just that: Dr. Kenya Hameed conducted a neuropsychological and educational evaluation of Z.D. on April 12 and 13, 2022. Ex. 16; *see also* SRO Decision at 3 (citing P. Ex. C).

Z.D.'s Parents received Dr. Hameed's report in May 2022. Pl. Mot. at 7 (citation omitted). The report recommended that Z.D. "primarily be considered under the classification of Specific Learning Disorder (SLD)," rather than Other Health Impairment, and diagnosed Z.D. with ADHD, Dyslexia, Dysgraphia, Social Phobia and Generalized Anxiety Disorder. Ex. 16 at 10. The report concluded that Z.D. "requires placement in a small, supportive, full-time special education school." *Id.* Although Z.D. "has benefitted from his multidisciplinary supports in some ways," Dr. Hameed reasoned, "such a placement is critical in order to provide [Z.D.] with the needed intensity of academic supports" as well as "for his socioemotional well-being." *Id.* at 10–11. The Parents provided the District with Dr. Hameed's evaluation on or around August 22, 2022. Tr. 686.

By the end of Z.D.'s third-grade year, his report card showed that he "continue[d] to read below grade level" but that he had "improved his ability to monitor his comprehension and self-

correct errors when necessary." Ex. 20 at 1. "With teacher support," the report card continued, Z.D. "was able to plan, research, and develop ideas to write." *Id.* His grades, meanwhile, demonstrated that Z.D. met curriculum expectations in every subject other than writing and English Language Arts ("ELA"). *See* Ex. 20. In those two subjects, Z.D. received many "2s"—showing that he was still "progressing toward curriculum expectations." *Id.* at 1–3. The school's Progress Report stated that Z.D. had "achieved his IEP goals in reading and writing by the end of the school year." IHO Decision at 23 (citing Tr. 243; Ex. 21). Z.D. was also being tutored twice a week. *Id.* at 24 (citing Tr. 1108).

That summer, Z.D. underwent an initial screening at The Windward School, a private school his Parents had identified as "one of the best in class" for students with dyslexia and dysgraphia. Tr. 1117:20–22; SRO Decision at 3 (citing Ex. 40). Five days after the screening, on August 31, 2022, Z.D.'s Parents enrolled him at Windward for the 2022-2023 school year. SRO Decision at 3 (citing P. Ex. U; Tr. 1158–59). They paid a $5,000 non-refundable deposit. *Id.* On September 4, 2022, Z.D.'s Parents sent a letter to the District informing them of their decision. Ex. 24. Z.D.'s Parents explained that they made the decision to enroll Z.D. at Windward because they believed that Z.D. was "not receiving the appropriate education in Irvington Schools based on his diagnoses." *Id.* at 2. They also notified the District that they "reserve[d] the right in the future to possibly seek tuition reimbursement for the costs of [Z.D.]'s placement at this special education school." *Id.* at 3. On September 6, 2022, Z.D.'s Parents officially withdrew him from the District. SRO Decision at 3 (citing Ex. 24 at 1).

On August 31, 2022, the same day that Z.D. was enrolled at Windward—but before the District knew that he had been enrolled—the CSE formally asked to reevaluate Z.D. *See* Ex. 23; Tr. 686:9–14. In a letter to Z.D.'s Parents, the District's Director of Pupil Personnel Services

explained "that it was the District's practice to conduct concurrent testing to further explain missing information or discrepant information to develop an appropriate program." IHO Decision at 24 (citing Tr. 597). Z.D.'s Parents did not sign the consent form. Tr. 598:10–11.

On September 16, 2022, the CSE convened once again. *See* Ex. 26 at 1. At that meeting, Z.D.'s Parents shared their concerns with the District's proposed IEP "in full detail" and elaborated on their September 4 letter. 621:7–10; *see* Ex. 26 at 1. The committee reviewed Dr. Hameed's private evaluation and "amended the accommodations and modifications as recommended by the private evaluation." Ex. 26 at 1. The CSE also determined that it would "reconvene to refine [Z.D.'s] reading and writing goals when the results of the additional testing are completed." *Id.* However, Z.D.'s Parents "expressed concern that the District requested concurrent evaluations after a private evaluation was submitted." *Id.*

Overall, the CSE "recommended the same program and related services as the April 2022 CSE with the addition of four 42-minute sessions per week of specially designed reading instruction in a small group, . . . one 30-minute session per week of counseling in a small group," "supplementary aids and services, program modifications, and accommodations" that included "that [Z.D.] be provided with models and examples, movement breaks, a positive reinforcement plan and special paper," "two 30-minute team meetings per year with the parents and two 42-minute sessions per month of literacy consultation," and "an assistive technology evaluation . . . to determine how [Z.D.] engaged with and would benefit from the use of assistive technology within the classroom setting." SRO Decision at 3–4; *see* Pl. Mot. at 8–9 (acknowledging that the SRO "found, correctly," that the CSE recommended this program).

Z.D.'s Parents, however, "did not agree that the IEP offered FAPE and Z.D. attended Windward for the 2022-23 school year." Pl. Mot. at 9 (citation omitted); *see* P. Ex. A ¶ 36.

According to the District Director's testimony, Z.D.'s Parents told the CSE that "they had already paid for the entire year at Windward, and they were not going to pull [Z.D.] at this time." Tr. 638:19–21. Z.D.'s Parents said they would "see where he was at the end of the year." *Id.* at 22–23.

On May 10, 2023, the CSE reconvened to review Z.D.'s fourth grade performance and to develop an IEP for the 2023-2024 school year. *See* Ex. 28. Z.D.'s Parents attended the meeting, along with representatives from the District and from Windward. *Id.* at 1. The CSE concluded that Z.D. "remained eligible for special education services as a student with an other health impairment" and "recommended the same special education program and related services as the September 2022 CSE." SRO Decision at 4. The CSE also added a 5:1 resource room program every other day for 42 minutes, as well as one 30-minute session of OT per week in a small group. *Id.*; *see* Pl. Mot. at 9; *compare* Ex. 28 at 16 *with* P. Ex. F at 14–15.

The CSE further "recommended the same supplementary aids and services, program modifications, and accommodations as the September 2022 CSE." SRO Decision at 4; *compare* Ex. 28 at 16–17 *with* P. Ex. F at 15–16. The CSE "recommended the same supports for school personnel on behalf of [Z.D.] as the September 2022 CSE with an additional recommendation for one 30-minute session per month of speech-language consultation." SRO Decision at 4; *compare* Ex. 28 at 18 *with* P. Ex. F at 16–17. And the CSE continued to recommend that Z.D. "undergo an assistive technology evaluation." SRO Decision at 4 (citing P. Ex. 28 at 17).

The day after the CSE meeting, Z.D.'s Parents informed the District that they intended to enroll Z.D. at Windward for the 2023-2024 school year. Pl. Mot. at 9 (citing P. Ex. K at 1; Tr. 1123). Parents made this decision before the IEP was drafted or finalized. IHO Decision at 37 (citing Tr. 648). The following day, on May 12, 2023, the District asked Parents for consent to

reevaluate Z.D. SRO Decision at 4 (citing Ex. 30 at 1). On May 24, 2023, Z.D.'s father signed and returned the consent form; Z.D. underwent a speech and language evaluation and a neuropsychological evaluation, which were completed on June 23, 2023, and August 22, 2023, respectively. SRO Decision at 4 (citing Exs. 32 at 1, 33 at 1.). In July, in between the assessments, the District informed Parents that the Board of Education had reviewed the May CSE's recommendations and supported the proposed IEP. SRO Decision at 4 (citing Ex. 29). Z.D. attended Windward for the 2023-2024 school year. SRO Decision at 4 (citing P. Exs. W–Y; DD).

On October 17, 2023, during Z.D.'s fifth grade year, the CSE met once again to review the results of the District's latest evaluations alongside reports from Windward. SRO Decision at 4 (citing Ex. 34 at 1). The CSE continued to recommend the same special education program, supplementary aids and services, program modifications and accommodations, as well as related services and supports for the school staff, as the May 2023 CSE. SRO Decision at 4–5; *compare* Ex. 34 at 1, 19, 21–22 *with* Ex. 28 at 1, 16–18. The October CSE added recommendations to "allow [Z.D.] wait time to respond to oral questions and to provide [Z.D.] with a copy of class notes in print or digital format," "additional testing accommodations," and "aligned [Z.D.'s] goals" to meet these recommended programs and services. SRO Decision at 5; Ex. 34 at 2.

The following month, on November 27, 2023, Z.D.'s Parents filed a due process complaint alleging that the District had denied Z.D. a FAPE for the 2022-2023 and 2023-2024 school years. SRO Decision at 5 (citing P. Ex. A ¶ 59). Z.D.'s Parents requested a finding that the District had denied Z.D. a FAPE for those two school years; a finding that the alleged violations "significantly impeded Parents' opportunity to participate in the decision-making process regarding the provision of a FAPE," which "caused a deprivation of educational benefits;" a

"finding that the District violated Section 504 and the ADA;" tuition reimbursement for Z.D.'s placement at Windward during the 2022-2023 and 2023-2024 school years; reimbursement for the cost of the private evaluations Parents provided the District; and "[p]ayment for transportation and other related costs." P. Ex. A at 12; *see also* SRO Decision at 5.

**III. The IHO Decision**

Between April 2, 2024, and July 16, 2024, the parties conducted seven days of proceedings before an Impartial Hearing Officer. SRO Decision at 5; *see* IHO Decision at 2. On November 14, 2024, the IHO rendered a sixty-eight-page opinion granting in part and denying in part Parents' requested relief. *See* IHO Decision. Broadly, the IHO concluded that the District "*did not* meet its burden of proving that it provided [Z.D.] FAPE during the 2022/23 school year"; that Parents' unilateral placement of Z.D. at Windward during that year was appropriate; and that Parents were entitled to tuition reimbursement for that school year. IHO Decision at 67. At the same time, the IHO concluded that the District "*did* meet its burden of proving that it provided [Z.D.] FAPE during the 2023/24 school year" and that Parents were not entitled to reimbursement for the private evaluations that they provided to the District. *Id.* at 68. The IHO also denied Parents' other requested relief "for lack of evidence in the record." *Id.*

More specifically, the IHO reasoned that the District failed to provide Z.D. with a FAPE for the 2022-2023 school year because the IEP developed on April 7, 2022, did not address "all areas of [Z.D.'s] suspected disability and failed to recommend appropriate special education services to address his continued areas of need, specifically in reading and writing, and in his social emotional deficits." *Id.* at 49. The IHO relied on Z.D.'s history beginning in kindergarten to highlight "many red flags" that "should have alerted the District that [Z.D.] required[,] at a minimum, additional testing"—especially in reading and writing. *Id.* at 53; *see id.* at 49–55.

The April 2022 CSE knew that Z.D. "had language deficits"; possessed "a clinical summary note indicating ADHD and possible language[-]based learning disability in reading and writing"; and "had an educational evaluation that demonstrated that [Z.D.] was below average in numerous areas of ELA," the IHO wrote. *Id.* at 50. The IHO also highlighted that Z.D. continued to rely on additional support—RTI and home tutoring—beyond the school's ICT services to meet his IEP goals. *Id.* at 53. Nevertheless, the IHO stressed, "the CSE did not request or conduct any further evaluations or assessments to comprehensively assess [Z.D's] reading and writing skills"—and "continued to recommend the same ICT program" that the IHO concluded was "insufficient to meet [Z.D.]'s needs." *Id.* at 50.

As to Z.D.'s social and emotional needs, the IHO underscored that Z.D. repeatedly told the school psychologist that he did not like leaving class and felt as though he was the only student who had to do so. *Id.* at 51 (citing Tr. 155). Yet Z.D.'s IEP did not address that concern, the IHO continued; it only added a counseling consult to address Z.D.'s peer relationships. *Id.* (citing Ex. 14 at 9).

The IHO also found that the IEP's shortcomings affected Z.D.'s Parents' ability to participate in the process. *Id.* at 53. "The District's reliance on RTI and delay in providing the Student with comprehensive testing significantly impeded meaningful parental participation," the IHO explained, "due to the lack of timely evaluation information which would have equipped the parent with knowing the Student's specific education needs (Dyslexia and Dysgraphia) and whether those needs warranted additional supports and services." *Id.* at 53.

Moreover, the IHO concluded, the changes the CSE implemented when it reconvened in September 2022 were insufficient to address these concerns—particularly because Z.D.'s Parents had by then provided the CSE with Dr. Hameed's report diagnosing Z.D. with Dyslexia,

Dysgraphia, Social Phobia, and Generalized Anxiety Disorder. *See id.* at 53–55. The IHO noted that, although the CSE added new goals to address Z.D.'s social and emotional challenges, "no new goals were added to address his reading and writing deficits, despite this being his biggest area of concern." *Id.* at 53–54.

Similarly, the IHO pointed out that even though the CSE "added a specially designed reading instruction and a literacy consult" to Z.D.'s modified IEP, it failed to "recommend [a] specially designed writing instruction." *Id.* at 54. Nor did the record reflect that the CSE considered "other options . . . such as a smaller classroom setting where the academic curriculum and [Z.D.'s] reading and writing deficits could be addressed within the classroom," the IHO wrote. *Id.* at 54. Finally, even though the September 2022 CSE recommended that Z.D. be tested further, the IHO determined that the CSE should have conducted further testing before the April 2022 meeting. *Id.* at 55. For all of these reasons, the IHO concluded, the District failed to provide Z.D. with a FAPE for the 2022-2023 school year. *Id.* at 55.

On the other hand, the IHO found that the IEP developed on May 10, 2023, for Z.D.'s fifth-grade year did provide him with a FAPE. *Id.* at 55. In particular, the IHO determined that Z.D.'s May 2023 IEP was "appropriate because the program and services, accommodations and modifications were aligned to [his] management needs." *Id.* at 58. This IEP, the IHO explained, "established goals that would inform specially designed reading and accommodation modifications for [Z.D.] so that he could access the general education curriculum in the least restrictive setting." *Id.* at 58. The IEP was therefore "reasonably calculated to enable [Z.D.] to receive educational benefits" and "would have provided [him] with a FAPE." *Id.* at 59.

Both parties appealed. *See* SRO Decision at 7–10. The District argued that the IHO erred in finding that the District had failed to provide Z.D. a FAPE for the 2022-2023 school year. *See*

*id.* Z.D.'s Parents, meanwhile, argued that the IHO erred in concluding that the District had provided Z.D. a FAPE for the 2023-2024 school year. *See id.*

## IV. The SRO Decision

On May 1, 2025, a State Review Officer sustained the District's appeal and denied Parents' cross-appeal. *Id.* at 36. The SRO concluded that "the hearing record supports a finding that the [D]istrict offered [Z.D.] a FAPE for the 2022-23 and 2023-24 school years." *Id.*

As to the first year, the SRO determined that the September 2022 CSE had sufficient evaluative information upon which to base its recommendations. *Id.* at 13–16. "The September 2022 IEP included information regarding the student's present levels of performance from the April 2022 CSE meeting"—including information about his speech and language development, study skills, reading, spelling, writing, social development, and physical development—"as well as updated information regarding the student's performance from the parents and the April 2022 neuropsychological evaluation," the SRO explained. *Id.* at 16; *see id.* at 16–18. The SRO also determined that the IHO did not err in relying on Z.D.'s background and educational history—because the September 2022 CSE relied upon that information to craft Z.D.'s IEP. *Id.* at 13.

The SRO found that the IHO's main critiques—that the District failed to recommend specifically designed writing instructions; that the District failed to update the IEP's reading and writing goals; and that the IEP failed to properly address Z.D.'s social-emotional needs—were inapposite.[2] *Id.* at 13–14; *see id.* at 19–23. First, the SRO concluded that "the hearing record contains sufficient evidence that the September 2022 CSE identified the student's writing needs and addressed them in the IEP with specially designed instruction and adequate supports." *Id.* at

---

[2] The SRO focused on the September 2022 IEP, which both parties acknowledged was the controlling IEP for Z.D.'s fourth-grade school year. SRO Decision at 13.

19; *see id.* at 19–22. Second, the SRO determined that the District "developed goals that addressed all of the student's areas of identified need[,] especially in the areas of reading and writing." *Id.* at 23; *see id.* at 22–23. And third, the SRO concluded that the September 2022 IEP "included appropriate social-emotional support" to address Z.D.'s "social-emotional needs." *Id.* at 25; *see id.* at 23–25.

All in all, the SRO held that the September 2022 CSE "recommended appropriate services, supports[,] and annual goals to address [Z.D.'s] special education needs." Accordingly, the SRO concluded that the "IHO's determination that the [D]istrict failed to provide the student with a FAPE for the 2022-23 school year must be reversed." *Id.* at 25.

As for the 2023-2024 school year, the SRO likewise concluded that the District provided Z.D. with a FAPE. *See id.* at 25–36. First, the SRO rejected Parents' argument that the CSE had predetermined how frequently Z.D. should be pulled out of his class. *See id.* at 25–27. That the CSE did not "adopt the parent's preferred programming recommendations does not mean that the outcomes of the meeting were predetermined," the SRO explained. *Id.* at 27 (citation omitted).

Next, the SRO engaged in a comprehensive evaluation of the May 2023 and October 2023 IEPs and upheld the IHO's prior determination that the District provided Z.D. with a FAPE for the 2023-2024 school year. *See id.* at 27–36. "[T]he hearing record supports that both the May and October 2023 IEPs incorporated updated evaluative information," the SRO wrote, "and the recommended programs in each IEP addressed the student's identified needs appropriately for the 2023-24 school year." *Id.* at 36. The SRO acknowledged that Z.D.'s Parents "may have preferred the program offered at Windward," but underscored that "the hearing record nonetheless supports the IHO's determination that the [D]istrict met its burden with sufficient evidence to demonstrate that it offered the student with a FAPE for the 2023-24 school year." *Id.*

Accordingly, the SRO concluded that "the necessary inquiry is at an end and there is no need to reach the issues of whether Windward was an appropriate unilateral placement . . . or whether equitable considerations weighed in favor of the [P]arents' request for relief." *Id.*

Z.D.'s Parents appealed the SRO Decision to this Court. ECF No. 1. The parties then filed cross-motions for summary judgment. *See* Pl. Mot.; Def. Mem.

**LEGAL STANDARD**

"In a district court proceeding under the IDEA, the parties and the court typically style the decision as a ruling on a motion for summary judgment, but 'the procedure is in substance an appeal from an administrative determination, not a summary judgment motion.'" *Bd. of Educ. of Yorktown Cent. Sch. Dist. v. C.S.*, 990 F.3d 152, 165 (2d Cir. 2021) (quoting *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 226 (2d Cir. 2012)). "The district court therefore 'engages in an independent review of the administrative record and makes a determination based on a preponderance of the evidence.'" *Id.* (quoting *M.H.*, 685 F.3d at 240) (cleaned up). In conducting this independent review, the court "must give due weight to the state administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Id.* (quoting *M.H.*, 685 F.3d at 240) (cleaned up). "On issues of law, however, such as the proper interpretation of the federal statute and its requirements, courts owe no deference to state hearing officers." *Id.* (internal citation and quotation marks omitted). "When parents seek to overturn an SRO's decision, they bear the burden of demonstrating that the decision was insufficiently reasoned or supported." *Phillips v. Banks*, No. 23-362, 2024 WL 1208954, at *2 (2d Cir. Mar. 21, 2024) (internal citation omitted).

## DISCUSSION

This discussion proceeds in four parts. First, the Court finds that the IEP process was procedurally adequate. Second, affording the SRO appropriate deference, the Court determines that Z.D.'s IEPs were substantively adequate for both the 2022-2023 and 2023-2024 school years. Third, the Court concludes that the District did not violate the Americans with Disabilities Act ("ADA") or Section 504 of the Rehabilitation Act of 1973 ("Section 504"). Finally, the Court determines that Z.D.'s Parents are not eligible for tuition reimbursement.

### I. The IEP Process Was Procedurally Adequate

For an IEP to satisfy the IDEA and provide a FAPE, it must be both procedurally and substantively adequate. *See Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 381 (2d Cir. 2003) (stating that courts review state administrative decisions under the IDEA for (1) whether "the State complied with the procedures set forth in the Act" and (2) whether the IEP developed by the school district is "reasonably calculated to enable the child to receive educational benefits[.]"). But not every procedural error will render an IEP inadequate. *See id.*; *Ambrister v. Banks*, No. 23-CV-2746 (JGLC) (BCM), 2024 WL 4326933, at *2 (S.D.N.Y. Sept. 27, 2024) (citing *M.H.*, 685 F.3d at 245)). Ultimately, whether procedural errors amount to a denial of FAPE turns on whether these errors (1) "impeded the [student's] right to a [FAPE]," (2) "significantly impeded the parents' opportunity to participate in the decision[-]making process regarding the provision of a [FAPE]," or (3) "caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii); *M.H.*, 685 F.3d at 245.

As an initial matter, Parents stress that the District bore the burden at the impartial hearing to prove that Z.D.'s IEPs complied with the IDEA. Pl. Mot. at 11–13. The SRO properly delineated this standard. SRO Decision at 12 ("The burden of proof is on the school district

during an impartial hearing, except that a parent seeking tuition reimbursement for a unilateral placement has the burden of proof regarding the appropriateness of such placement."); *see* N.Y. Educ. Law § 4404(1)(c). To the extent that Parents challenge the SRO's decision on this basis, then, the Court rejects those arguments. *See id.*

Parents next raise two procedural issues that they argue warrant the reversal of the SRO's decision. Pl. Mot. at 13–20. First, Parents contend that the September 2022 CSE failed to consider new evaluative information—namely, Z.D.'s diagnoses—after Parents provided the District with Dr. Hameed's report. *Id.* at 13–16. Parents add that the October 2023 CSE likewise failed to consider updated information about the effects of classroom pull-outs on Z.D. *Id.* at 16–17. Second, Parents argue that the District denied them the opportunity to meaningfully participate in developing Z.D.'s IEPs. *Id.* at 17–20. Neither argument is availing.

With respect to the first issue, as the SRO explained in detail, the September 2022 CSE did consider Dr. Hameed's report in developing Z.D.'s IEP. *See* SRO Decision at 13–18. The SRO began by making clear that all parties agreed that the September 2022 IEP was the controlling IEP for Z.D.'s 2022-2023 school year. *Id.* at 13. No party disputes this. *See generally* Pl. Mot.; Def. Mem. Then, the SRO detailed the information that the CSE considered in developing Z.D.'s 2022-2023 IEP. *See* SRO Decision at 13–18. Notably, the SRO accurately reflected that "[t]he meeting summary indicated that the parents shared 'a private evaluation for the Committee to review'" and that "the district considered . . . the April 2022 private neuropsychological evaluation" in crafting Z.D.'s IEP. *Id.* at 15–16 (quoting P. Ex. F at 1).

The SRO then enumerated many specific ways in which the CSE relied upon Dr. Hameed's findings to build Z.D.'s IEP. *See id.* at 16–18; *see, e.g.*, *id.* at 17 ("According to the September 2022 IEP, the April 2022 neuropsychological evaluation [Dr. Hameed's report]

indicated the student's significant frustration was due to laborious demands required of him to decode words and effectively read . . . ."). Indeed, the September 2022 CSE meeting notes make clear that the committee not only reviewed Dr. Hameed's private evaluation, but "amended the accommodations and modifications as recommended by the private evaluation." Ex. 26 at 1.

Parents concede that the SRO reviewed Dr. Hameed's report. "The SRO correctly concluded," they write, "'that the September 2022 CSE had sufficient evaluative information before it to make appropriate recommendations for the student for the 2022-23 school year.'" Pl. Mot. at 14 (quoting SRO Decision at 18). But, Parents argue, the CSE's "failure to make any substantive changes to Z.D.'s programming after receiving Dr. Hameed's evaluation establishes that the CSE did not *actually consider* that evaluative information." *Id.* (emphasis added). However, as the SRO also correctly reasoned with regards to predetermination, that the CSE did not "adopt the parent[s'] preferred programming recommendations does not mean that" the CSE failed to actually consider the report. SRO Decision at 27 (citing *B.K. v. New York City Dep't of Educ.*, 12 F. Supp. 3d 343, 359 (E.D.N.Y. 2014)).

More to the point, the record is replete with examples of how the CSE did, in fact, consider Dr. Hameed's findings. *See, e.g.*, Ex. 26 at 1 (explaining that the CSE "amended the accommodations and modifications as recommended by the private evaluation"); *see also* SRO Decision at 16–18. And the record reflects that, after considering Dr. Hameed's report, the September 2022 CSE did modify the April 2022 IEP: the September 2022 CSE added "four 42-minute sessions per week of specially designed reading instruction in a small group, . . . one 30-minute session per week of counseling in a small group," "supplementary aids and services, program modifications[,] and accommodations," "two 30-minute team meetings per year with the parents and two 42-minute sessions per month of literacy consultation," as well as "an

assistive technology evaluation . . . to determine how [Z.D.] engaged with and would benefit from the use of assistive technology within the classroom setting." SRO Decision at 3–4; *see* Ex. 26. Parents' argument that the September 2022 CSE failed to "actually consider" Dr. Hameed's report is thus unconvincing. Pl. Mot. at 14.

So, too, is Parents' argument that the October 2023 CSE "failed to consider updated information."[3] Pl. Mot. at 16. Parents contend that the October 2023 CSE failed to take into account the neuropsychological evaluation that the District itself initiated, which was completed in August 2023, or the testimony of the District's own expert. *Id.* at 16–17. In particular, Parents argue that the October 2023 IEP did not reflect these experts' concerns with repeatedly pulling Z.D. out of class. *Id.* But, again, Parents' argument falls short. As above, Parents only argue that the October 2023 IEP did not reflect their programming preferences—not that the CSE failed to consider the August 2023 evaluation or the District's own expert testimony in crafting Z.D.'s IEP. Instead, the record is clear: the CSE "reviewed updated neuropsychological testing and reports from [Z.D.'s] current school" in order to "determine[] [that] refinements to [Z.D.'s] current IEP goals were appropriate." Ex. 34 at 1.

Second, Z.D.'s Parents were not denied the opportunity to meaningfully participate in developing Z.D.'s IEPs. *See* Pl. Mot. at 17–20. Parents argue that more than physical attendance at CSE meetings is required to meaningfully participate in developing an IEP, and rehash their prior predetermination arguments. *Id.*; *see* SRO Decision at 25–27. The Court agrees that "parents are in the unique position to offer valuable information on their children's strengths, to describe the need for services, and to share specific concerns with the entire IEP team"—and that

[3] Parents do not specify that they are referring to the October 2023 CSE, but argue that a "2023" CSE failed to incorporate information from August 2023—leading the Court to deduce that they were referring to the October 2023 CSE, not the May 2023 CSE. *See* Pl. Mot. at 16–17.

more than mere physical attendance at CSE meetings is necessary to constitute meaningful participation. Pl. Mot. at 19. Here, however, the record demonstrates that Parents not only attended but actively and meaningfully participated in the discussions during the September 2022 CSE meeting and the May and October 2023 CSE meetings. *See* Exs. 38, 39; SRO Decision at 26–27; *see also J.G. ex rel. N.G. v. Kiryas Joel Union Free Sch. Dist.*, 777 F. Supp. 2d 606, 648 (S.D.N.Y. 2011) (internal citations omitted) ("Courts have rejected predetermination claims where the parents actively and meaningfully participated in the development of the IEP, or where there was credible evidence that the school district was open-minded at the IEP meeting.").

Once again, that the CSE did not "adopt the parent[s'] preferred programming recommendations does not mean that the outcomes of the meeting were predetermined," or that Parents did not have an opportunity to meaningfully participate. SRO Decision at 27 (citing *B.K.*, 12 F. Supp. 3d at 359); *see also P.K. ex rel. P.K. v. Bedford Cent. Sch. Dist.*, 569 F. Supp. 2d 371, 383 (S.D.N.Y. 2008) ("The fact that the District staff ultimately disagreed with the opinions of plaintiffs and their outside professionals does not mean that plaintiffs were denied the opportunity to participate in the development of the IEP's, or that the outcomes of the CSE meetings were 'pre-determined.' A professional disagreement is not an IDEA violation."). Although Z.D.'s Parents "may have been dissatisfied" by some of the District's final decisions, the Court "cannot conclude that they were denied a meaningful opportunity to participate in the formulation of [Z.D.'s] IEP." *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 194 (2d Cir. 2005).

Accordingly, neither of Parents' procedural allegations warrants reversing the SRO's decision.

## II. The IEPs Were Substantively Adequate

Parents next argue that Z.D.'s IEPs were not substantively adequate for both the 2022-2023 and 2023-2024 school years. *See* Pl. Mot. at 20–24. "A school district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement." *A.C. ex rel. M.C. v. Bd. of Educ. of The Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 173 (2d Cir. 2009) (cleaned up). The substantive adequacy of an IEP, however, is "precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers." *Grim*, 346 F.3d at 382. That is because the Court must be "mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *C.S.*, 990 F.3d at 165; *see also A.C.*, 553 F.3d at 173 (internal citation omitted) ("Because administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy.").

Put otherwise, "the role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed." *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 189 (2d Cir. 2012) (quoting *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112–13 (2d Cir. 2007)) (cleaned up). Although courts do not "not 'rubber stamp' administrative decisions," they "must defer to [an] administrative decision [particularly where] the state officer's review 'has been thorough and careful.'" *M.W. ex rel. S.W. v. New York City Dep't of Educ.*, 725 F.3d 131, 138–39 (2d Cir. 2013) (first quoting *M.H.*, 685 F.3d at 240; and then quoting *R.E.*, 694 F.3d at 184). And "[w]here, as in our case, the IHO and SRO disagree, the general rule is that 'courts must defer to the reasoned conclusions of the SRO as the final state administrative determination.'" *R.E.*, 694

F.3d at 189 (quoting *M.H.*, 685 F.3d at 246). "[A] court must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned, in which case a better-reasoned IHO opinion may be considered instead." *Id.*

Applying the requisite deference to the SRO's thorough and careful review of Z.D.'s IEPs for both the 2022-2023 and 2023-2024 school years, then, the Court concludes that both IEPs were substantively adequate. *See Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998); *see also R.E.*, 694 F.3d at 189 (noting that "the deference owed to an SRO's decision depends on the quality of that opinion").

**A. The 2022-2023 IEP Was Substantively Adequate**

Parents assert that Z.D.'s 2022-2023 IEP was not substantively adequate because it did not provide appropriate reading instruction, did not include specially designed writing instruction, and did not adequately address Z.D.'s emotional distress that stemmed from his being pulled out of class. Pl. Mot. at 20–24; *see also* ECF No. 20 at 3–4. Parents also contend that the SRO's decision is not due deference because "the SRO failed to evaluate critical, undisputed evidence bearing directly on the adequacy of the District's program"—namely, Z.D. being pulled out of class. ECF No. 20 at 2.

As an initial matter, the Court grants the SRO's decision deference because the decision is both "thorough and careful.'" *M.W.*, 725 F.3d at 139 (quoting *R.E.,* 694 F.3d at 184). Over the course of thirty-six single-spaced pages, the SRO meticulously assesses the history, context, and adequacy of Z.D.'s IEPs—and does not, as Parents claim, merely rely on "conclusory generalities and unsupported assertions." ECF No. 20 at 2; *see* SRO Decision. To the contrary, the decision delves into the record, buttresses its conclusions with well-reasoned support, and addresses the IHO decision directly—particularly where the SRO disagrees with the prior IHO

decision. *See, e.g.*, SRO Decision at 19–24. The SRO also directly addresses Z.D. being pulled out of the classroom. *See* SRO Decision at 23–27. Finally, the SRO analyzes numerous "matters requiring educational expertise," *R.E.*, 694 F.3d at 189—matters on which the Court "lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy," *C.S.*, 990 F.3d at 165 (quoting *M.H.*, 685 F.3d at 240). Therefore, the SRO decision is due appropriate deference from this Court.

Substantively, the SRO performed an in-depth review of Z.D.'s needs and why his 2022-2023 IEP was adequate. SRO Decision at 12–25. "That review includes an examination of affidavit testimony from a special education teacher," numerous psychologists, and experts "evaluating the CSE's determinations and the documents that CSE used." *Rosenberger v. Banks*, No. 24-CV-6334 (JGLC), 2025 WL 2773299, at *5 (S.D.N.Y. Sept. 29, 2025); *see* SRO Decision at 12–25. "That review also includes an examination of the IEP itself, compared with the special education teacher's testimony, state regulations, the evaluative information provided to the CSE, and the student's needs." *Rosenberger*, 2025 WL 2773299, at *5; SRO Decision at 16–25.

In its examination of Z.D.'s IEP, the SRO thoroughly assesses Parents' three areas of concern: reading, writing, and classroom pull-outs. *See* Pl. Mot. at 20–24. As to reading, the SRO first lays out Z.D.'s abilities and challenges. SRO Decision at 17. The SRO then evaluates the September 2022 IEP's reading-related recommendations, including the four additional "42-minute sessions per week of specially designed reading instruction in a small group using a multi-sensory, research-based reading intervention"; "ICT services"; and "specially designed reading instruction." *Id.* at 21. Then, taking Dr. Hameed's report into account, the SRO reasonably concludes that, because "the hearing record supports finding that the student made some progress during the prior school year[,] the September 2022 CSE acted reasonably when it

recommended programming for the 2022-23 school year that was similar to what the student received during the 2021-22 school year." *Id.* at 22 (citing Tr. 162; *S.H. ex rel. W.H. v. Eastchester Union Free Sch. Dist.*, No. 10-CV-3927 (KMW), 2011 WL 6108523, at *10–11 (S.D.N.Y. Dec. 8, 2011)).

The SRO also addresses the September 2022 IEP's reading goals directly. SRO Decision at 22–23. Relying on the testimony of the school psychologist and CSE chairperson—who notably "testified that the goals for reading addressed the student's 'decoding and comprehension' needs," and that the school's special education teacher would have the opportunity to work with Z.D. individually or in a small group "to develop[] those skills"—as well as on the contents of the September 2022 IEP itself, the SRO concludes that "the [D]istrict developed goals that addressed all of the student's areas of identified need especially in the areas of reading and writing." *Id.* at 23 (quoting Tr. 79, 94–95).

Parents argue that Z.D.'s "2022-23 IEP did not include sufficient systematic, phonetics-based instruction to address his dyslexia and dysgraphia" and that "the District did not revise the [IEP's] reading goals, which remained inappropriate." Pl. Mot. at 20. But "[i]n light of the district's broad discretion to adopt programs that, in its educational judgment, are most pedagogically effective, we cannot simply assume that the decision to rely heavily on [another] method or style of instruction is necessarily inappropriate." *M.H.*, 685 F.3d at 257. The Court must also "remain equally mindful that [it] cannot substitute [its] own 'notions of sound educational policy for those of the school authorities' under review." *M.W.*, 725 F.3d at 139 (quoting *M.H.*, 685 F.3d at 240). Moreover, the Court does not find that the IHO's decision was "better[] reasoned"; it accordingly defers to the SRO's "reasoned conclusions." *R.E.*, 694 F.3d at 189 (quoting *M.H.*, 685 F.3d at 246).

The same is true of the SRO's assessment of the IEP's writing recommendations. The SRO devotes substantial space to evaluating the IHO's prior conclusion that the District failed to recommend specially designed writing instruction. SRO Decision at 19–22 (citing IHO Decision at 54). The SRO incorporates testimony from Z.D.'s third-grade special education teacher (who was part of the April 2022 CSE), the school psychologist, and the hearing record, as well as addressing Dr. Hameed's report directly, to conclude that the "record contains sufficient evidence that the September 2022 CSE identified the student's writing needs and addressed them in the IEP with specially designed instruction and supports." SRO Decision at 19.

Parents assert that Z.D.'s "writing goal should have been broken into parts" and that his writing and spelling goals were "too broad and non-specific to Z.D.'s educational needs." Pl. Mot. at 23 (citing Tr. 947). But again, "a court must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned." *R.E.*, 694 F.3d at 189. The Court makes no such conclusion here; the SRO supported its finding with reasoned analysis. Accordingly, the Court also defers to the SRO's analysis of the IEP's writing recommendations.

Finally, as discussed *supra*, the SRO appropriately discussed Z.D. being pulled out of the classroom. *See* SRO Decision at 23–27. The SRO acknowledges that Z.D.'s Parents "had consistently shared their concerns with the number of pullout services the student was getting." *Id.* at 24. But the SRO also explained that the September 2022 IED "noted the student needed support in thinking flexibly and more openly about receiving academic support, including when such support required being pulled from the classroom." *Id.* at 25. Indeed, the September 2022 IEP specifies that one of Z.D.'s goals is to "demonstrate increased flexibility in thinking about himself as a learner, as evidenced in his ability to identify at least three positive outcomes that

result from requesting, receiving, and accepting academic support." Ex. 26 at 14. Applying the requisite deference to the SRO's analysis, the Court therefore concurs that "the evidence in the hearing record supports that the September 2022 IEP included appropriate social-emotional support for the student," including with regard to pulling Z.D. out of class to receive support. SRO Decision at 25.

Accordingly, "[i]n light of the SRO's careful review, the Court affirms the determination that the [2022-2023] IEP as a whole was adequate to provide a FAPE." *Rosenberger*, 2025 WL 2773299, at *6 (citing *A.C.*, 553 F.3d at 173).

**B. The 2023-2024 IEP Was Substantively Adequate**

The 2023-2024 IEP is likewise adequate. Both the IHO and SRO agreed that the District provided Z.D. with a FAPE during that year. *See generally* IHO Decision; SRO Decision. And Parents' critiques of the 2023-2024 IEP echo those they levy against the 2022-2023 IEP. *See* Pl. Mot. at 20–24 (arguing that "[b]oth the 2022-23 and 2023-24 IEPs were substantively inappropriate"). Parents do specify that the October 2023 IEP's speech and language goals "are very broad and do not demonstrate the hierarchy of skills leading to work on the goals that's written." Pl. Mot. at 23. But this alone is no basis for determining that Z.D.'s 2023-2024 IEP fails to provide a FAPE; as discussed, "a court must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned." *R.E.*, 694 F.3d at 189.

"Here, again, the SRO's thorough and careful review means that deference is especially warranted." *Rosenberger*, 2025 WL 2773299, at *5 (citing *Walczak*, 142 F.3d at 129). Therefore, for the reasons previously stated and as both the IHO and SRO concluded, the Court finds that

Z.D.'s 2023-2024 IEP was "reasonably calculated to enable [him] to receive educational benefits." *Grim*, 346 F.3d at 381.

## III. The District Did Not Violate the ADA or Section 504

Next, Parents argue that the District violated the ADA and Section 504, which "prohibit discrimination on the basis of disability in a wide variety of contexts." Pl. Mot. at 24 (quoting *A.J.T. v. Osseo Area Sch. Dist.*, 605 U.S. 335, 339 (2025)). Specifically, Parents contend that the District's "failure to provide research-based reading instruction is a denial of a reasonable accommodation" and thus violates both statutes. *Id.* at 25 (citing *Rogich v. Clark Cnty. Sch. Dist.*, No. 17-CV-1541 (RFB) (NJK), 2021 WL 4781515, at *9 (D. Nev. Oct. 12, 2021)).

"The standards set forth in both Title II of the ADA and Section 504 of the Rehabilitation Act are generally the same and thus, the Second Circuit treats claims under the two statutes identically." *Close v. Bedford Cent. Sch. Dist.*, No. 23-CV-4595 (CS), 2024 WL 3427213, at *10 (S.D.N.Y. July 16, 2024) (citation omitted). In order to establish a claim under these statutes, a "Plaintiff must offer proof that (1) [he] has a disability for purposes of Section 504 and Title II; (2) he was otherwise qualified for the benefits he was denied; (3) he was denied the benefit by reason of his disability." *K.M. ex rel. D.G. v. Hyde Park Cent. Sch. Dist.*, 381 F. Supp. 2d 343, 357–58 (S.D.N.Y. 2005). These claims require showing more than a mere violation of the IDEA. *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 841 (2d Cir. 2014). Instead, "[t]o demonstrate discrimination under the ADA or Section 504, the plaintiff must show that the defendant acted with at least 'deliberate indifference' to the rights secured by those statutes." *J.L. v. N.Y.C. Dep't of Educ.,* No. 17-CV-7150 (PAC) (KHP), 2024 WL 2864330, at *15 (S.D.N.Y. Jan. 26, 2024) (citing *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98 (2d Cir. 2001)).

Parents fail to establish that the District acted with deliberate indifference. The record reflects that the District did recommend specially designed reading instruction in Z.D.'s 2022-2023 and 2023-2024 IEPs. *See* SRO Decision at 3–4, 21, 35. Both the IHO and SRO agreed on and stated as much. *See id.*; IHO Decision at 54, 57. This conduct negates any argument of deliberate indifference. Furthermore, because the Court concluded that A.D. was not denied a FAPE during the relevant school years, the ADA and 504 claims necessarily fail. *See A. S. ex rel. A.S. v. N.Y.C. Dep't of Educ.,* No. 24-CV-9689 (ER), 2026 WL 1079380, at *33 (S.D.N.Y. Apr. 21, 2026).

Accordingly, the Court dismisses the ADA and Section 504 claims.

## IV. Parents Are Not Entitled to Tuition Reimbursement

Finally, Parents argue that equitable considerations warrant tuition reimbursement for both the 2022-2023 and 2023-2024 school years at Windward. *See* ECF No. 20 at 9–10. "In determining whether parents are entitled to reimbursement, the Supreme Court has established a two part test: (1) was the IEP proposed by the school district inappropriate; (2) was the private placement appropriate to the child's needs." *Gagliardo*, 489 F.3d at 111–12 (citing *Sch. Comm. of the Town of Burlington v. Dep't of Educ.*, 471 U.S. 359, 370 (1985)). "If the challenged IEP was adequate, the state has satisfied its obligations under the IDEA and the necessary inquiry is at an end." *M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ.*, 226 F.3d 60, 66 (2d Cir. 2000). "Only if a court determines that a challenged IEP was inadequate should it proceed to the second question." *Id.*

Here, because the Court has determined that the District did not deny Z.D. a FAPE, the "necessary inquiry is at an end." *Id.* at 66. The Court need "not reach the issue of equitable

considerations for reimbursement." *Rosenberger*, 2025 WL 2773299, at *3 n.1 (citing *M.C.*, 226 F.3d at 66). Parents are not entitled to tuition reimbursement for either school year.

**CONCLUSION**

For the reasons stated above, the Court DENIES Plaintiffs' motion for summary judgement and GRANTS Defendant's motion for summary judgment. The Clerk of Court is respectfully directed to terminate ECF Nos. 16 and 18, enter judgment consistent with this Order, and close the case.

Dated: September 28, 2026
White Plains, New York

SO ORDERED.

Jessica Clarke

JESSICA G. L. CLARKE
United States District Judge